CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

JONATHAN U. LEE (CABN 148792)
WENDY M. GARBERS (CABN 213208)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Jonathan.Lee@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 4:23-CR-00191-AMO-6 |
| Plaintiff, | SENTENCING MEMORANDUM OF THE UNITED STATES |
| v. | |
| DANNY GARCIA, ET AL, | |
| Defendants. | |

1

**TABLE OF CONTENTS**

2   I.     INTRODUCTION ................................................................................................1

3   II.    OFFENSE AND RELATED CONDUCT .............................................................1

4   A.    The Charges ........................................................................................................1

5   B.    The Robberies ....................................................................................................2

6         1.    March 2022 Robbery ..............................................................................2

7         2.    November 2022 Robbery .......................................................................2

8         3.    December 2022 Robbery ........................................................................5

9   C.    Uncharged Conduct ............................................................................................7

10        1.    C.R.A.F.T. robbery on August 6, 2022 ..................................................7

11        2.    Burglary of Audi Oakland on November 24, 2022 ..................................7

12   D.    Ghost Town gang membership ..........................................................................7

13   III.   CRIMINAL HISTORY ......................................................................................10

14   IV.   VICTIM IMPACT AND RESTITUTION...........................................................11

15   A.    Victims ..............................................................................................................11

16        1.    Coin store robbery................................................................................11

17        2.    Jewelry store robbery ...........................................................................12

18        3.    Marijuana business robbery ..................................................................12

19   B.    Restitution.........................................................................................................13

20        1.    Coin store robbery................................................................................13

21        2.    Jewelry store robbery ...........................................................................13

22        3.    Marijuana business robbery ..................................................................13

23   V.    SENTENCING GUIDELINES CALCULATIONS ............................................13

24   VI.   APPLICABLE LAW ..........................................................................................13

25   A.    Sentencing Framework .....................................................................................13

26   B.    Conspiracy, Aiding and Abetting, and Robbery Affecting Interstate Commerce
Framework.......................................................................................................14

27

28   VII.  SENTENCING RECOMMENDATION .............................................................15

    A.    Nature of the offense........................................................................................15

B.    Need for deterrence..................................................................................................17

C.    History and characteristics of the defendant ..........................................................18

VIII.    CONCLUSION.......................................................................................................19

# <u>TABLE OF AUTHORITIES</u>

Page(s)

## <u>Cases</u>

*Ortiz-Magana v. Mukasey*,
   542 F.3d 653 (9th Cir. 2008) ................................................................................. 14

*Young v. United States*,
   22 F.4th 1115 (9th Cir. 2022) ............................................................................... 14

*United States v. Carty*,
   520 F.3d 984 (9th Cir. 2008) .......................................................................... 13, 14

*United States v. Dominguez*,
   954 F.3d 1251 (9th Cir. 2020), *cert. granted, judgment vacated*, 142 S. Ct. 2857 (2022).................. 14

*United States v. Henry*,
   984 F.3d 1343 (9th Cir.), *cert. denied*, —— U.S. ——, 142 S. Ct. 376, 211 L.Ed.2d 200 (2021)........ 14

*United States v. Jones*,
   678 F.2d 102 (9th Cir. 1982) ................................................................................ 14

*United States v. Joseph*,
   No. 19-169767, 2022 WL 850036 (9th Cir. Mar. 22, 2022)........................................... 14

*United States v. Knight*,
   No. 21-10197, 2023 WL 34698 (9th Cir. Jan. 4, 2023), *cert. denied*, 143 S. Ct. 2478, 216 L. Ed. 2d 441 (2023)................................................................................................... 14

*United States v. Sannicandro*,
   434 F.2d 321 (9th Cir. 1970) ................................................................................ 15

## <u>Statutes</u>

18 U.S.C. § 924(c)(3)(A) ...................................................................................... 14

18 U.S.C. § 1951 ......................................................................................... 1, 2, 8

18 U.S.C. § 3553(a) ............................................................................................ 14

18 U.S.C. § 3553(a)(2) ........................................................................................ 13

U.S.C. § 3553(a)(2) ........................................................................................... 13

# I.     INTRODUCTION

Danny Garcia is a longtime Ghost Town gang member with an extensive criminal history that includes eight prior felony convictions.  He admits that shortly after his most recent discharge from parole, he joined the violent conspiracy at issue here.  There is some evidence he was involved at an earlier point.  In any case, Garcia was an active participant in two of the violent armed robberies – H Bee in San Pablo and Joyus in Oakland.  In both, the robbers struck quickly to overpower the premises with firearms, restrained and threatened victims, held them at gun point, and – in the case of Joyus – struck the victim with a firearm.  These robberies succeeded, in part, because of the planning and coordination the conspirators used to ensure their success.  Garcia lived at 141 West Embarcadero in Oakland, and the robbers met at or near that address before and after each of the three charged robberies, as well as before and after uncharged criminal conduct in August and November 2022.  With ready freeway access in close proximity to transportation corridors and the Bay Bridge, the use of Garcia's residence as an operational base was a key factor in this crime spree.  Balancing the aggravating factors, which weigh heavily in favor of the government's recommendation, with the mitigating factors, the United States requests a sentence of 113 months imprisonment.

## II.     OFFENSE AND RELATED CONDUCT

### A.     The Charges

Defendant Danny Garcia plead guilty to the three counts against him in the Second Superseding Indictment.  ECF 296.

| Count No. | Charged Offense | Defendants Charged |
|---|---|---|
| One | Conspiracy to Commit Robbery Affecting Interstate Commerce, March 18, 2022, through January 26, 2023, in violation of 18 U.S.C. § 1951 | Jenkins<br>Barnett<br>Rabon<br>Smith-Stewart<br>Burrell<br>**Garcia**<br>Garnett<br>Hutchinson<br>Joseph |
| Two | Hobbs Act Robbery and Aiding and Abetting Hobbs Act Robbery on March 18, 2022 (Robert Johnson Stamp & Coin Company, San Francisco) in violation of 18 U.S.C. § 1951 | Jenkins<br>Barnett<br>Garnett<br>Joseph |

| Three | Hobbs Act Robbery and Aiding and Abetting Hobbs Act Robbery on November 12, 2022 (H Bee Jewelry Store, San Pablo) in violation of 18 U.S.C. § 1951 | Jenkins<br>Barnett<br>Rabon<br>**Garcia**<br>Hutchinson |
| Four | Hobbs Act Robbery and Aiding and Abetting Hobbs Act Robbery on December 24, 2022 (Joyus Wellness, Oakland) in violation of 18 U.S.C. § 1951 | Jenkins<br>Barnett<br>Rabon<br>Smith-Stewart<br>Burrell<br>**Garcia**<br>Garnett |

## B.    The Robberies

For each robbery, the government provided the phone data and charts showing the locations of the relevant phones before, during and after each robbery to the defense.

### 1.    March 2022 Robbery

Defendant Garcia was not charged with this count, but the government includes this discussion because the location of the co-defendants's phones show that they returned to the vicinity of Garcia's apartment in Oakland shortly after this robbery. These three defendants – Jenkins, Barnett, and Joseph – then traveled to H Bee Jewelry Store in San Pablo later that same day. Defendants Barnett, Jenkins and Joseph have pled guilty to this count. Sentencing exhibits describing the offense conduct, the victims' experience in the robbery, and the losses are attached to the Declaration of Jonathan U. Lee ("Lee Dec.") as Exhibits A-C.

### 2.    November 2022 Robbery

The PSR describes this robbery at paragraphs 22-25. In his plea agreement, Garcia admitted his involvement in the robbery.

> At approximately 4:00 p.m. on November 12, 2022, we arrived at H Bee Jewelry in two getaway cars, each bearing a stolen license plate. We drove both vehicles toward the rear exterior door, which was open toward a rear drive area and gave us access to the store's interior including the behind the counter space. Five of us entered H Bee Jewelry, wearing clothing to disguise their identities, while at least two others waited outside in the getaway cars. Firearms were brandished towards employees inside the store. We took bags of jewelry valued at more than $95,000 from the store. Immediately after committing the robbery, my co-conspirators and I reentered the two getaway cars waiting outside and travelled back to my Oakland residence where we met before the robbery. I later wore pieces of stolen jewelry. For example, at a birthday party on or about December 22, 2022, I wore jewelry that had been stolen in the H Bee robbery. In

addition, I was depicted in photographs while wearing jewelry stolen from H Bee, including photographs posted on social media accounts of my co-conspirators. On my Instagram account (king_dan_dan37), I attempted to sell some of the jewelry stolen from H Bee.

PSR ¶ 33. Garcia admitted that he went inside H Bee, while two others waited outside.

The phone location evidence shows that Garcia's location followed a similar pattern to the other indicted suspect's phones, including Rabon, Hutchinson, Barnett and Jenkins, before, during and after the robbery. Their phone location moved from Garcia's residence to H Bee in San Pablo and then back to Garcia's residence in Oakland. The phone location data of multiple defendants shows that Garcia's residence was a key operational location in the H Bee robbery, providing a meeting place before and after the robbery.

The government provided security video from H Bee. Lee Dec. Exhs. D-H. The video shows the two vehicles approaching the rear door, the robbery inside the business, and the co-conspirators departing in the two vehicles. The robbers used violence against the victims by holding or restraining them at gunpoint. No fewer than five robbers entered, and they first encountered an adult male victim at the rear door.



They placed a gun to his chest, turned him around, and roughly pushed him to the floor, where

1  one of the robbers continued to straddle or sit on the victim, preventing him from leaving.



12  The robbers then encountered a second adult male who was exiting the toilet.  The robber sitting

13  atop the first victim was in close proximity to the second victim as the door opened and pointed the

14  firearm at the second victim, holding him in the toilet for the duration of the robbery.



Another

28  robber took a position near the counter and extended his arm to point a second firearm at the persons in

the front counter area of the premises.



One of those near the front counter was the adult, elderly female who was crying out in fear. There were three others in the area, including two adults and a young child. This robber continued to point the firearm in their collective direction. The robbers ransacked the jewelry store. Two exhibits document a portion of the losses. *See* Lee Dec., Exhs. I-J.

### 3. December 2022 Robbery

The PSR describes this robbery at paragraphs 26-30. In his plea agreement, Garcia admitted to this role:

> On December 24, 2022, I participated in an armed robbery of Joyus Wellness Club, a licensed marijuana business located on Union Street in Oakland. When the Joyus worker (Victim 4) exited Joyus and attempted to enter his vehicle, two of my co-conspirators, wearing hoods and masks, approached Victim 4 at gunpoint, rifled through his pockets, and took Victim 4's personal property. Victim 4 was verbally and physically directed through the business. Firearms were brandished towards Victim 4, and Victim 4 was hit in the head with a firearm. We repeatedly demanded from Victim 4 the "budded weed" and "money." We took a bag containing marijuana plant trimmings from Joyus and left the business in two getaway cars. We then travelled back to my Oakland residence where we met before the robbery.

Again, the phone location evidence shows that Garcia's location followed a similar pattern to the other co-defendants' phones before, during and after the robbery. Their phone location moved from Garcia's residence to Joyus and then back to Garcia's residence in Oakland. Garcia's residence was a key operational location in the Joyus robbery.

The security video at the premises shows the co-conspirators taking the victim out of his vehicle at gunpoint and using force to direct him throughout the premises. Lee Dec., Exhs. K-M.






C.    **Uncharged Conduct**

1.    C.R.A.F.T. robbery on August 6, 2022

On August 6, 2022, multiple members of the conspiracy broke into the C.R.A.F.T. marijuana dispensary in Oakland.  The victim reported loss of inventory with a value of at least $100,000.  The owner of the dispensary came to the location and was accosted by one of the suspects who showed a firearm, which caused the owner to flee.  Garcia's phone location evidence shows he was on the scene of this robbery.

2.    Burglary of Audi Oakland on November 24, 2022

On November 21, 2022, co-defendant Smith-Stewart purchased an Audi at Audi Oakland near the Coliseum using a false identity and supporting documents.  She gave $9,500 in cash as a down payment for the Audi.  Aramiya Burrell was with her.  When the salesperson put the cash in the safe, Burrell expressed interest in the safe and at one point tried to pick it up.

Three days later, on November 24, 2022, at around 2:00 a.m. (Thanksgiving morning), the Audi dealership was burglarized and the safe was stolen.  Cell phone data records show that Mr. Garcia along with multiple co-defendants were present at the Audi Oakland premises at the time of the burglary.  The phone records show that the group met at or near Garcia's residence in Oakland before and after the burglary.  The phone location data makes clear the vital role Garcia's residence in Oakland played in this burglary.

D.    **Ghost Town gang membership**

Mr. Garcia is a longtime member of Ghost Town gang.

First, he has been adjudicated to be a member of Ghost Town.  In 2017, he pled guilty to a street gang enhancement under state law in the Santa Clara County case for which he received consecutive sentences of 5 years and 8 months.  PSR ¶77.  The indictment in that case charged Garcia and others with an auto burglary scheme in connection with their membership in Ghost Town, and Garcia also faced attempted murder charges.  https://www.sfgate.com/promotions/extranews/article/21-charged-in-Bay-Area-car-burglary-ring-6682515.php (last accessed 8/3/2025)

Second, Garcia has continued to assert his Ghost Town membership when in custody.  In response to a grand jury subpoena, Alameda County Sheriff's Office provided classification information

at Santa Rita Jail for Mr. Garcia, which as recently as 2023 indicated that Garcia admitted he was in Ghost Town:

> [Mr.] GARCIA first came into custody with the Alameda County Sheriff's Department on 3/18/2004.  During that intake interview with classification, he stated he Associates with Ghost Town from West Oakland.  On 9/23/2015 GARCIA came back into custody and had no changes to his classification file.  On 02/02/2023 GARCIA returned to Santa Rita Jail during that time he stated he is still in good standings with the Ghost Town criminal street gang.  GARCIA has no documented assaults or reports in custody.  Lee Dec., Exh. P.

Santa Rita reported that Mr. Garcia has gang-related tattoos, including "GHOST" on his right forearm and "NUTZ" on this left forearm.  Lee Dec., ¶ 18.  Photos of these tattoos have been produced in discovery.  Id.

Third, Garcia's membership in Ghost Town is further supported by social media activity in 2022-2023.  After the H Bee jewelry store robbery, Garcia wore stolen jewelry while associating with Ghost Town gang members who also wore stolen jewelry from H Bee.  For example, photos show him during a birthday party of a fellow Ghost Town gang member.  The photo below was posted to Garland Rabon's Instagram account on 12/24/2022; Garcia is on the left.



Posted to "gmoneyyttg" account on 12/24/2022

In another example, Danny Garcia appears in the photo below, wearing a watch stolen from H Bee, which was posted in January 2023 in a social media account of co-defendants Burrell and Smith-Stewart.



Defendant Garcia is also depicted in the Miya Surprise Youtube video, displaying stolen jewelry



and interacting with other Ghost Town gang members.  Lee Dec., Exh. Q.



This evidence demonstrates Garcia's loyalty to the Ghost Town gang to the current time period, not ending six years ago.  Within the last six years, Garcia provided an operational base to the gang's violent armed conspiracy targeting community members in three Bay Area counties; participated in at least two of those robberies and other uncharged criminal conduct of the gang; and informed jail authorities that he was in the gang for classification purposes.

### III.    CRIMINAL HISTORY

Mr. Garcia has an extensive criminal history, with eight felony convictions, including four after he turned 27 years old.  The Probation Department calculates his criminal history score as 18, which places him in criminal history category VI.  Mr. Garcia committed the offenses resulting in the multiple felony convictions despite generally escalating terms of imprisonment: 16 months in 2005 (¶68), 3 years in 2008 (¶71), and 5 years, 8 months in 2017 (¶77).

Garcia's 2017 conviction was for a violent felony directed at a police officer.  According to the incident report, an officer attempted to stop Garcia who was driving a vehicle in Sunnyvale.  Garcia did not stop and instead attempted to run the officer over.  The government produced the report including

the unredacted statement of witness J.A., who reported that the officer called out "police" while wearing a jacket that had "Police" written on it and that the driver of the suspect vehicle (Garcia) was trying to hit the police officer. Lee Dec., Exh. R. Initially charged with attempted murder, Garcia pled guilty to "assault with a deadly weapon not firearm: police officer/firefighter" and to a street gang act enhancement. Garcia was paroled in June 2019, discharged from parole in June 2022, by which time he became involved in this violent conspiracy.

Garcia came into custody in this case in November 2024, when he failed to stop in a timely manner when a Nevada State trooper used emergency lights and sirens and failed to comply with directives from the trooper, including falsely stating he had no driver's license.

## IV.    VICTIM IMPACT AND RESTITUTION

### A.    Victims

The victims in this case suffered physical and psychological injuries at the hands of Mr. Garcia and his co-conspirators. The government will recount the victims' experience in summary.

#### 1.    Coin store robbery

There were two victims present during the March 2022 robbery of the coin store in San Francisco by Mr. Barnett and his co-conspirators. *See* Lee Dec., Exhs. A-B. K.B., an immigrant from Europe who was in his early 70s at the time, was present with his adult son E.B., who was in his early forties. K.B., whose description of the robbery was produced in discovery, stated that three suspects forced their way into the business by pushing open the front door. All three were armed with firearms, wearing masks and gloves. One suspect forced K.B. to sit in a chair, with the other two forced E.B. to the ground, tied him up, and hit him on the head. K.B. said the suspect who stayed with him pointed a firearm at his head for the entirety of the robbery, telling K.B. that he was in charge. His voice did not sound nervous or scared to K.B. He then forced K.B. into the adjacent room where the other two had his son on the ground. The suspect told K.B. that if he wanted for him and his son to live, he will open the safe. K.B. opened the one safe that was still locked. The suspects then took cash, coins, and watches. One suspect told the other that the group only had 3-5 minutes before they needed to leave. Before leaving the coin store, the suspects took K.B. and E.B.'s wallets and cell phones. One of the suspects pulled K.B.'s license out of his wallet, showed it to him, and told him that they know where the two

victims live and warned them not to do anything stupid.  E.B. received treatment for his injuries at S.F. General Hospital.  K.B. went to Kaiser Hospital and received treatment for one week due to the injuries he received in the robbery.

### 2. Jewelry store robbery

The victims inside the jewelry store included H.S. (the owner), Y.S. (his elderly mother), and two employees I.C. and J.C., as well as customers who have not been identified.  Surveillance footage shows the store owner closing the rear door, at which point five hooded and masked men enter the store pushing through the same door.  The robbers point a firearm as H.S. as they shove him inside the store and down on the floor.  One of the men pushes H.S. to the ground, yelling "Don't fucking move!  Don't fucking move!  Stay down!"  That man stays on top of H.S. for the duration of the robbery, restraining his movement.  Y.S. shrieks in fear as she backs up and then turns to run to the front of the store.  Another man points a firearm towards the store's front, where the customers and young child had been shopping.  I.C. exits the toilet and is met by the robber atop H.S., and the robber holds I.C. at gunpoint.  At the same time, other robbers ransack the store of approximately $300,000-$500,000 worth of jewelry from several different drawers, containers, and safes, and then fled in two getaway cars.  The entire robbery took less than two minutes.

### 3. Marijuana business robbery

There was one individual present for this robbery, A.P., who described how the robbers confronted him as he was leaving the Joyus premises.  A.P. followed his standard practice for leaving Joyus, which was to call a coworker J.A., who had access to the exterior video cameras, so he could give A.P. the "okay" to leave.  A.P. went to his vehicle and started the engine when one of the robbers appeared with a firearm pointed at A.P.  Other suspects also appeared and they got A.P. out of the vehicle, and then they took his driver's license, debit card, cash and cell phone.  The suspects took A.P. back inside the business.  They led him by the back of his neck.  They asked him where the money was repeatedly.  A.P. directed the suspects to the vault.  The suspects had A.P. lay down on the ground, face down, and one of the suspects held him down with a foot.  Later, A.P. got to his feet and the suspects took him to the immature marijuana plants area.  He told the suspects the business did not have mature plants.  The suspects escalated their demands and tone.  One of them struck A.P. on the head with the

back of a gun. The suspects acted with a sense of urgency. They wore masks and hoods. After they took A.P. to an office area, kicking in the door to gain entry, A.P. heard them yelling about the police and fleeing. A.P. stayed on the ground until all the suspects left Joyus. There were unauthorized charges on his debit card in the following days, but his bank reimbursed him for those charges. He bought a new cell phone. He received treatment for his bleeding cut on his head, and he felt a bump in that area in the following days. *See* Lee Dec., Exh. N.

### B.    Restitution

The government requests that the Court order restitution for the victims in the following amounts, payable by Mr. Garcia, jointly and severally with the other defendants who in subsequent sentencing hearings are also culpable for these robberies.

#### 1.    Coin store robbery

The victim estimates losses of approximately $300,000. The government produced discovery documenting stolen coins and other inventory valued at $150,338.

#### 2.    Jewelry store robbery

The jewelry store estimated the loss at between $300,000 and $500,000. The government produced discovery documenting losses of approximately $159,400.

#### 3.    Marijuana business robbery

The loss amount for this robbery is undetermined. The quantity of marijuana trimmings had a quantifiable value, but the government has not received a loss estimate or other documentation.

### V.    SENTENCING GUIDELINES CALCULATIONS

The parties' plea agreement calculates a Total Offense Level of 29 after acceptance. Probation calculates a Total Offense Level of 30. PSR ¶¶ 40-65. Using the Criminal History Category VI, the advisory sentencing range is 151-188 under the plea agreement, or 168-210 using Probation's calculation.

### VI.    APPLICABLE LAW

### A.    Sentencing Framework

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520

F.3d 984, 991 (9th Cir. 2008).  The Court should begin the process of determining an appropriate

sentence by calculating the correct sentencing range under the Guidelines. *Id*.  After determining the

appropriate Guidelines calculation, the Court should then evaluate the sentence for substantive

reasonableness in light of the factors set out in Section 3553(a).  *Carty*, 520 F.3d at 991-93.  Under 18

U.S.C. § 3553(a), in arriving at the appropriate sentence for the defendant, the Court should consider

these factors applicable to this case, among others: 1) the nature and circumstances of the offense and

the history and characteristics of the defendant; 2) the need for the sentence imposed to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense; 3) the need for the sentence imposed to afford adequate deterrence to criminal conduct; 4) the

need to avoid unwarranted sentence disparities among defendants with similar records who have been

found guilty of similar conduct; and 5) the need to provide restitution to any victims of the offense.

### B.  Conspiracy, Aiding and Abetting, and Robbery Affecting Interstate Commerce Framework

Violations of Title 18, section 1951, also known as Hobbs Act robbery, are a crime of violence.

*See United States v. Knight*, No. 21-10197, 2023 WL 34698, at *2 (9th Cir. Jan. 4, 2023), *cert. denied*,

143 S. Ct. 2478, 216 L. Ed. 2d 441 (2023), *citing United States v. Dominguez*, 954 F.3d 1251, 1261 (9th

Cir. 2020), *cert. granted, judgment vacated*, 142 S. Ct. 2857 (2022), *and reinstated in part by* 48 F.4th

1040 (9th Cir. 2022) ("We reaffirm that Hobbs Act robbery is a crime of violence under 18 U.S.C. §

924(c)(3)(A).").  The same is true for the offense of aiding and abetting such a robbery.  *United States v.

Joseph*, No. 19-169767, 2022 WL 850036, at *1 (9th Cir. Mar. 22, 2022), citing *Young v. United States*,

22 F.4th 1115, 1122 (9th Cir. 2022) ("[T]here is no distinction between aiding-and-abetting liability and

liability as a principal under federal law.")

An offender who aids and abets another offender if "treated as if they committed the offense as

principals." *See United States v. Henry*, 984 F.3d 1343, 1356 (9th Cir.), *cert. denied*, —— U.S. ——, 142

S. Ct. 376, 211 L.Ed.2d 200 (2021) ("Defendants found guilty of armed bank robbery under ... [an]

aiding-and-abetting theory are treated as if they committed the offense as principals."); *see also Ortiz-

Magana v. Mukasey*, 542 F.3d 653, 659 (9th Cir. 2008) (stating that "aiding and abetting an [offense] is

the functional equivalent of personally committing that offense"); *United States v. Jones*, 678 F.2d 102,

1  104 (9th Cir. 1982) (holding that "any person who aids or abets" a violation of § 2113 "is punishable as
2  a principal"); *United States v. Sannicandro*, 434 F.2d 321, 324 (9th Cir. 1970) ("This circuit is
3  committed to the view that whoever aids or abets the commission of an offense against the United States
4  is punishable as a principal.").

5  ## VII.    SENTENCING RECOMMENDATION

6  Based upon a consideration of the Sentencing Guidelines and the factors set forth in 18
7  U.S.C.§3553(a), the government respectfully recommends that the defendant be sentenced to 113
8  months in prison, three years of supervised release, forfeiture, and full restitution in an amount to be
9  determined.  Such a sentence would be sufficient, but not greater than necessary, based on the nature of
10 the offense, the need for deterrence, and the history and characteristics of the defendant.  The
11 recommended sentence accounts for the aggravating sentencing factors while also balancing the
12 mitigating factor of Mr. Garcia's acceptance of responsibility, which occurred relatively quickly after he
13 was charged.

14 ### A.    Nature of the offense

15 The nature of the offense conduct is extremely serious.  To focus on the two robbery counts of
16 conviction for Garcia, he was an active participant in both robberies.  Garcia and his co-conspirators
17 targeted the victim businesses because they had valuable inventory – jewelry, coins, and marijuana.
18 Their motive was financial gain.  Each of the robberies was a coordinated takeover.  The co-conspirators
19 used firearms to gain control of the premises.  They pointed the guns at the victim employees, who were
20 placed in fear of their lives by this conduct.  The co-conspirators used the guns to restrain and direct
21 individuals inside the businesses to be quiet, to lay down, to move to a location the robbers desired, all
22 through threat of force.  In the November 2022 jewelry store robbery, multiple co-conspirators surged
23 inside the rear door.  One pointed a firearm at an adult male victim at the rear door, who was forced to
24 the floor with a gun pointed at him.  That robber then got on top of the male victim, holding him in place
25 on the floor.  An elderly female employee screamed as she retreated toward the front of the store, where
26 two customers waited by the counter, as a co-conspirator pointed a handgun in their direction and yelled
27 at them.  A male employee opened the door to exit the toilet near the rear door, only to have a robber
28 point a gun at him.  This was the same robber who straddled the first male victim to hold him down on

1    the floor.  Garcia is liable as a principal for the violent conduct.

2       In the December 2022 marijuana business robbery, the co-conspirators removed the victim

3 employee from his vehicle at gunpoint and then directed him back into the premises.  For several

4 minutes they forced him to move throughout the premises at gunpoint.  They forced him to sit down at

5 gunpoint as they demanded he reveal the location of the marijuana.  They struck him on the head, too.

6 Garcia is liable as a principal for the violent conduct.  This was an organized and calculated use of

7 firearms to show force and to use force.  The robbers showed that the firearms were not just for display

8 as they struck a victim in the head with a firearm.  The entire group of co-conspirators benefited.  They

9 gained control and committed the robberies in a short period of time, because they held victims at

10 gunpoint.  The use of the firearms to strike a victim also increased their control level and made complete

11 compliance with their demands much more likely.  The violence of this case is an aggravating factor.

12       Likewise, the coordination of the co-conspirators is an aggravating factor.  This was a criminal

13 partnership, and it was an effective one, executing multiple crimes over the course of several months.

14 First, the manner and execution of the robberies involved advance planning and coordination.  Each

15 robbery targeted stores with cash-reserves or valuable items (marijuana dispensaries or jewelry/coins).

16 Each was a takeover style robbery with co-conspirators filling pre-planned roles—including who would

17 serve as the getaway driver and who would enter the business.  This made the takeover more efficient

18 and therefore more effective.  Each robbery involved suspects dressed in disguises (relatively generic

19 hoodies and masks) to conceal their identities.  Each robbery involved the threatened use of firearms.

20 Significantly, each robbery involved coordinated movement with the robbers meeting at or near

21 Defendant Garcia's apartment before and after the robbery.  Second, the getaway cars used during each

22 robbery show the group planned the robberies in advance by coordinating their transportation in a way

23 to avoid detection.  In the coin store robbery, a co-defendant rented the getaway vehicle in a false name

24 and used a stolen license plate.  In the H Bee jewelry store robbery, both getaway cars had stolen license

25 plates. In the marijuana business robbery, a co-defendant used a rental vehicle while another used a

26 vehicle purchased with a stolen identity.  Fourth, there is evidence that the co-conspirators scouted their

27 robbery targets in advance.  For example, on the evening of the coin store robbery in March 2022, Mr.

28 Barnett and at least two co-conspirators visited the H Bee business in San Pablo during business hours.

They then robbed H Bee a few months later in November 2022. Fifth, the cell site data shows the co-conspirators met at similar locations before each of the robberies—evidence that indicates they met to plan their heists in advance. They met at or very near Garcia's residence in Oakland. Again, all of the members of the conspiracy benefited from this careful planning and coordination. The defendant who served as the getaway driver made the rapid takeover and speedy departure possible. That defendant's contributions made it more likely that another co-conspirator would be emboldened to point a firearm at a victim or strike that victim with the firearm because each co-conspirator knew of the plan to be quick about their business. Because they operated as a criminal partnership, each member of the conspiracy is culpable for the acts in furtherance of their agreement. Here, Garcia participated in two of the three robberies, and he engaged in conspiratorial acts to ensure the group's success, to include selling stolen property. Significantly, Garcia's Oakland residence amounted to a home base for the conspiracy, as the robbers met there before and after their crimes: Coin Store Robbery in March 2022, CRAFT burglary that turned into a robbery in August 2022, H Bee Robbery in November 2022, the Audi dealership burglary in November 2022, and the Joyus Robbery in December 2022.

## B.    Need for deterrence

The need for deterrence in this case is an aggravating sentencing factor. Mr. Garcia has eight prior felony convictions, resulting in nearly twenty years of imprisonment. Yet he committed two armed robberies in this case. He was a key player in the conspiracy, providing an operational benefit to the endeavor. Garcia, in doing so, made it more likely that others could participate successfully. Garcia is a longtime member of the Ghost Town criminal gang, even before the Santa Clara conviction adjudicated his membership. Oakland's Department of Violence Prevention has concluded that the Ghost Town gang is among the three groups "responsible for the majority of group-driven violence" in Oakland, including the gun violence that has exploded in recent years.[1] Lee Dec., Ex. O. The recommended sentence will protect the community from Mr. Garcia's future offenses.

In addition, the need for general deterrence is high also. The community has a strong interest in

---

[1] *See* Oaklandside, "Oakland violence prevention efforts get boost from $6 million state grant," Aug. 2, 2022, https://oaklandside.org/2022/08/02/oakland-violence-prevention-efforts-get-boost-from-6-million-state-grant/.

1 curbing this violent conduct. According to crime data, robberies involving the use of a firearm increased

2 in Oakland by 50% in 2023, the calendar year following the offense conduct in this case. Robbery

3 crews using firearms to overwhelm small businesses is an ongoing concern. The victims in this case

4 provided vivid descriptions of the fear and terror they experienced at the hands of Mr. Garcia and his co-

5 conspirators. The recommended sentence will signal to like-minded individuals (and to Mr. Garcia) that

6 the Court does not tolerate this offense conduct and will impose serious consequences for those proven

7 to have committed similar conduct.

8       **C.**    <u>**History and characteristics of the defendant**</u>

9       Mr. Garcia is a 41-year-old native of Oakland. At the time of his arrest in November 2024, he

10 was a resident of Las Vegas, Nevada. His life experiences include growing up in a dangerous

11 neighborhood, losing his father to a murder in 1990, and having a mother who was not part of his life

12 until recently. He has four siblings and is the second in birth order. The PSR states that his other

13 siblings work in real estate, security, or entertainment. Garcia was close to his grandmother, and he

14 experienced difficulties with his grandmother's relationship with a man who was abusive. Mr. Garcia is

15 married, and he and his spouse had their first child, a son, in 2023. He has been in a relationship with

16 his wife for several years before their marriage, and she describes him a caring, family-oriented, and

17 thoughtful, among other favorable terms.

18       Garcia has an extensive criminal history, as noted above, and is an active member of the Ghost

19 Town gang. Notably, Garcia informed the Probation Department that he has not been associated with

20 the Ghost Town gang for the past six years, which is inconsistent with the rest of the evidence of his

21 connection with the gang.

22       Mr. Garcia's history and characteristics support the government's recommended sentence. Mr.

23 Garcia's conduct shows that he will join in a violent robbery crew that uses gun-related violence to

24 terrorize small businesses. The evidence of his conduct also demonstrates that Garcia is not merely a

25 participant in the conspiracy but rather an active member who supplied critical logistics to the criminal

26 enterprise. To his credit, Mr. Garcia has admitted his conduct and accepted responsibility for it. The

27 government's recommendation takes into account this acceptance of responsibility.

28

# VIII.    <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully requests that the Court impose a sentence of 113 months of imprisonment, followed by a 36-month term of supervised release, with each of the conditions set forth in the plea agreement, including the expanded search condition.  This recommendation is based on the parties' plea agreement and guideline calculation of 151-188 months.  The government's recommendation of 113 months is a downward departure of 25% below the low end of that guideline range.  In light of the factors discussed above, the government requests that the Court impose a term of 113 months imprisonment.


DATED:  August 5, 2025                              CRAIG H. MISSAKIAN
                                                    United States Attorney


                                                    _____/s/ Jonathan U. Lee_____
                                                    JONATHAN U. LEE
                                                    WENDY M. GARBERS
                                                    Assistant United States Attorneys